# DECLARATION OF MARK LEFKOW

MARK LEFKOW, the Declarant, states on oath and deposes as follows:

1.

My name is Mark Lefkow. I am over the age of eighteen (18) years and am legally competent to make this Declaration. The facts stated in this Declaration are within my personal knowledge.

2.

I am counsel for Hellmuth & Johnson, PLLC ("Hellmuth & Johnson"). Pursuant to Fed. R. Civ. P. 65(b)(1)(B), I certify that I have not given notice to Defendants or the bank that maintained the beneficiary account of the wire or ACH transfer that is the subject of this case of Plaintiff's Motion for Temporary Restraining Order in the case of *Auto-Rec. Body Works, Inc., et al., v. John Doe 1, et al.*, because of the of the nature of the scheme alleged by Plaintiffs, including the improper accessing or hacking of email accounts, the transmittal of false wire/ACH instructions, and the use of a bank account in New York to divert funds from an asset purchase closing taking place in Minnesota. These facts suggest, based on my experience with similar cases, that notice to Defendants will encourage Defendants to abscond with the closing funds further.

3.

I have been admitted to practice law in the State of Georgia since 2000. I have handled over ten cases involving fraudulent wires, fraudulent ACH's, and fraudulent diversions of funds from lawyers and businesses, in both state courts and federal courts. In my experience handling these cases, once parties to a fraudulent wire scheme are notified that legal proceedings are pending, they typically take actions to move the funds beyond the reach of Court process, including issuing cashier's checks, utilizing second-level money mule accounts both at the recipient bank and banks holding accounts of subsequent money mules, purchasing digital assets such as Bitcoin, and wiring funds domestically and overseas.

4.

Likewise, giving advance notice to the bank housing the beneficiary account in fraudulent wire cases can also result in funds moving beyond the reach of Court process. In one prior case I handled, a beneficiary bank issued a certified check to the accountholder of funds fraudulently wired in response to my client's request to refund the wire. In another case, the beneficiary bank allowed the accountholder receiving fraudulently diverted funds to open a new account, and then the money mule transferred funds to this new account to avoid a wire reversal from the sending bank. These bank actions have created additional difficulty in recovering

fraudulently diverted funds.

5.

As to the scope of the injunction sought by the Plaintiffs in this case, there have been many occasions in cases I have handled where transferees of fraudulent wires and ACH transfers have opened multiple accounts, both at the same bank that received the transfer and at other banks. These other accounts shelter and hide the fraudulently transferred funds from wire reversals and law enforcement until the person directing the scheme calls upon the money mule to transfer or move the funds through various means, including Bitcoin and other digital assets, certified checks, wires, ACH transfers, and deposits into other money mules' accounts. In one case, the initial money mule opened accounts at two banks and, immediately upon receiving fraudulent transfers, wrote checks to herself that she then deposited in her account at the other bank. In another case, the initial money mule opened multiple accounts at the same bank to avoid wire reversals, then withdrew funds at automated teller machines from these other accounts at the same bank. Funds remained in another account at the same bank when I obtained injunctive relief that covered all such accounts in the name of the initial money mule and I was able to recover those funds for my client. On multiple occasions, I have found that recipient accounts and transferee accounts hold funds from other fraudulent schemes perpetrated on other

parties, and I have been able to return funds to those parties if an accounting determines they have rights to the funds.

6.

As to the timing for the hearing on the preliminary injunction, the recipient bank will usually take time to respond to a subpoena regardless of the time set for compliance. I have typically set subpoena compliance for recipient banks within the 14 days for the duration of a temporary restraining order, but despite quick action to get banks served with subpoenas and the TRO, I have an approximately 10% success rate in gaining full compliance by the time of the hearing. However, in many cases, within those fourteen days, I have succeeded more than 50% of the time in obtaining contact information for the accountholder, making contact with the accountholder, and determining what, if anything remains in the recipient account and related account.

7.

I will be unavailable, out of the country for a cyber security speaking engagement, from April 26 to May 2, 2024, but available from May 3, 2024, onwards. Therefore, I respectfully request that the hearing on the request for preliminary injunction in this case be set for April 23, April 24, April 25, or May 3, 2024, or that I have the opportunity to attend the hearing remotely.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this, the 16th day of April, 2024.

______________________
**MARK LEFKOW**
**Declarant**